UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| JOSHUA AARON ELSWICK, | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 3:22-CV-33-GNS |
| | ) | |
| v. | ) | |
| | ) | |
| RYAN DERROUGH, | ) | |
| Individual capacity | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Comes the Plaintiff, Joshua Elswick, and submits the following response to the

Defendant's Motion for Summary Judgment:

**INTRODUCTION**

Joshua Elswick is forty-four (44) years old. For the vast majority of his life, Josh has

suffered from paranoid schizophrenia, bipolar disorder, and intermittent explosive disorder.[1] Like

so many individuals suffering with serious mental illness, Josh has a long history of self-

medicating and substance abuse addiction. These illnesses have led to numerous arrests and

incarcerations for Josh, including multiple detentions at the Bullitt County Detention Center

(hereinafter referred to as "BCDC"). On September 2, 2022, Josh was arrested at his home by the

Mount Washington Police Department while he was experiencing an episode of psychosis. Upon

arrival, the Mount Washington Police Officers readily recognized Josh from previous interactions

---

[1] Exhibit 1, *Plaintiff's Deposition,* pg. 42, 15-16

with him, as this was not their first call to his residence.[2] After he was arrested, Mount Washington Police Officers transported Josh to BCDC.[3] Josh was restrained with both leg shackles and his hands cuffed from the front of his person.[4] Due to their familiarity with him, officers were aware of Josh's mental health status and diagnosis.[5] While waiting for the completion of the booking paperwork, Josh continuously expressed his fear for his life and safety to officers and expressly telling them that suffers from paranoid schizophrenia.[6] Josh waited patiently and calmly, still restrained, seated on a bench in the booking room for the paperwork to be completed.[7] Josh was not disruptive, hostile, threatening or aggressive to any officer.[8] He did not attempt to destroy any property, harm any person, or harm himself.[9]

The defendant, former BCDC Lieutenant Ryan Derrough, entered the booking area while speaking to Josh, appearing to ask him questions. Josh was not hostile. He did not attempt to stand up or move to another area. He was cooperative throughout the interaction. Derrough then exited room shortly thereafter.[10] Josh did eventually stand up from his seat on the bench but did not attempt to touch any person or property within the booking room.[11] Josh even asked an officer for permission prior to throwing away his water cup due to the trashcan being directly next to the individual officer in the room.[12] The officer supervising Josh in the booking area did not appear to be remotely concerned with Josh's movement.[13]

---

[2] Exhibit 2, Affidavit of James Puszert, pg. 2 at 9.
[3] *Id.* at pg. 4
[4] *Id.,* pg. 3 at 19.
[5] *Id.,* pg. 2 at 9.
[6] Exhibit 1, *Plaintiff's Deposition,* pg. 135 at 2-8.
[7] *Id.,* pg. 133 at 21-25 & Booking Area Video
[8] *Id.,* pg. 133 at 21-25 & Booking Area Video
[9] Exhibit 3, Booking Area Video ending in 4648870
[10] Exhibit 4, Booking Area Video ending in 4609075
[11] Exhibit 3, Booking Area Video ending in 4648870
[12] Exhibit 5, Booking Area Video ending in 4669800
[13] Exhibit 3, Booking Area Video ending in 4648870

Eventually, while seated on the bench in the booking area, Josh was surrounded by four officers, including Defendant.[14] Josh, already having a schizophrenic episode, became increasingly scared and paranoid that the officers, including Defendant, were going to harm him.[15] While other deputies were explaining to Josh that they would be removing his leg shackles, Defendant had already begun putting on the G.L.O.V.E.S.[16] Defendant did not explain to Josh the purpose or function of the G.L.O.V.E.S and did not explain Josh would be electrocuted and burned by them.[17]

Defendant did not attempt to use other methods of de-escalation or any other means of lesser force prior to electrocuting Josh with the G.L.O.V.E.S.[18] Defendant did not have reasonably appropriate training or experience with the equipment. BCDC had no specific policy regarding use of the G.L.O.V.E.S.[19]

When first entering the holding cell, one officer was able to gain control over Josh and hold him, without the need for additional equipment. The video from the holding cell clearly demonstrates that one guard held Josh in a sitting position. Use of the G.L.O.V.E was unreasonable, unnecessary, unwarranted, and excessive.[20] Interestingly, Josh was constantly restrained in handcuffs and shackles while at BCDC. The only exception being when his handcuffs were removed, and Josh was placed in the WRAP. Use of the G.L.O.V.E when Josh was restrained in handcuffs and shackles and not reasonably presenting a threat to others was excessive force.[21]

---

[14] Exhibit 1, *Plaintiff's Deposition,* pg. 136 at 2-8 & Booking Area Video ending in 4761145
[15] Exhibit 1, *Plaintiff's Deposition,* pg. 136 at 17-24
[16] Exhibit 6, Booking Room Video ending in 4761145 at 01:48
[17] Exhibit 1, *Plaintiff's Deposition,* pg. 139 at 19-25
[18] *Id.*
[19] Exhibit 7, *Defendant's Deposition,* pg. 55 at 15-22
[20] Exhibit 8, Holding Cell Video ending in 7089.
[21] Exhibit 8, Holding Cell Video ending in 7089

Defendant's use of the G.L.O.V.E. was deemed to be the use of excessive force by an internal investigation at BCDC.[22] Not only was Defendant disciplined with a three-day unpaid suspension, but Defendant was also demoted from the rank of Lieutenant to the rank of Sergeant as a consequence of using excessive force and violating BCDC policy. [23]

After he was placed in the WRAP, Josh was left without access to a bathroom or water for an extended period of time, exceeding four (4) hours. Josh had a history of detainment at BCDC. Defendant and other BCDC staff members were aware that Josh suffered from severe mental health disorders, as he had interacted with these law enforcement officers previously and because Josh expressed this verbally multiple times. Defendant denied Josh access to the healthcare he needed, dismissing Josh's pleas for help for over four (4) hours. Josh was deprived of water for over four (4) hours after being aggressively manhandled and repeatedly electrocuted by Defendant.

Defendant concedes that BCDC policy permits deputies to override the decisions of the Quality Correctional Health Care ("QCHC") nurse when that decision affects facility security or is a decision in favor of increased inmate care. Defendant knew that BCDC was ill-equipped to handle situations concerning a mental health crisis.[24] Within his capacity as a Lieutenant and supervisor at BCDC, Defendant knew, or should have known, that use of excessive force against an inmate constitutes a deprivation of the inmates Constitutional rights.

Based upon the factual information provided herein, a reasonable juror could find that Defendant used excessive force against Josh by using the shock G.L.O.V.E while Josh was in shackles and not presenting a threat to himself, correction workers, or others. Given the evidence presented by both the Defendant and the Plaintiff, whether the Defendant's use of force was

---

[22]Exhibit 9, Derrough Investigation Summary Report, pg. 1 & 13
[23] *Id.*
[24] *Defendant's Motion for Summary Judgment,* pg. 26-27

excessive in these circumstances is a question to be adjudicated by the jury rather than summary judgment. Further, because a reasonable juror could find that Defendant subjected Josh to conditions of confinement that violate his constitutional rights as to healthcare and basic life necessities, summary judgment is inappropriate on that issue as well.

**STANDARD OF REVIEW**

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The Federal summary judgment standard applies the "scintilla" rule: summary judgment is improper unless a "scintilla" of evidence exists on which a jury could reasonably return a verdict in the respondent's favor. *Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193 (2010). Summary judgment is only appropriate in cases where no genuine issue of material fact exists and and the moving party is entitled to judgment as a matter of law. *Id.*

To determine whether an issue is proper for summary judgment, the trial court must view the evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving or opposing party. The burden lies upon the movant to demonstrate that no genuine issues of material fact exist and that judgment as a matter of law is appropriate. *Hubble v. Johnson*, 841 S.W.2d 169 (1992).

**QUALIFIED IMMUNITY IS NOT AVAILABLE**

**TO DERROUGH ON ANY CLAIM**

When sued in their individual capacities, public officers and employees enjoy only qualified official immunity. *A.H. v. Louisville Metro Gov't,* 612 S.W.3d 902, 905. To determine whether a Defendant is entitled to qualified immunity in an excessive force claim, the Court must

utilize a two-step inquiry. A defendant is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established. Courts are not required to review the above-described qualified immunity considerations in sequence, i.e., considering first whether the facts alleged make out violation of a constitutional right and then whether that right was clearly established at the time of the defendant's alleged misconduct. *Cole v. City of Dearborn,* 448 Fed. Appx. 571, 572.

## A. DERROUGH VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHT TO BE FREE FROM GRATUITOUS VIOLENCE.

The official immunity doctrine protects a government official in making decisions involving the exercise of discretion, but "only if his acts are not otherwise wrongful." *Yanero v. Davis*, 65 S.W.3d 510, 521. In *Harlow v. Fitzgerald, supra,* the United States Supreme Court defined the "good faith" component of qualified official immunity as having both an objective and subjective aspect.

> The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S. Ct. 992, 1001, 43 L. Ed. 2d 214 (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically, the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury…." *Ibid.* (emphasis added).

457 U.S. at 815, 102 S. Ct. at 2736-37 (emphasis in original). *Yanero v. Davis*, 65 S.W.3d 510, 523.

Use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. It is well-recognized,

including by the Plaintiff, "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins v. Cyranek*, 805 F.3d 760, 766-67 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396-97). "But just because we must look at the circumstances through the eyes of a reasonable officer does not mean . . . that we must accept the officers' subjective view of the facts when making this assessment." *Jacobs*, 915 F.3d at 1041. Rather, "**the action must be viewed in light of the surrounding circumstances**." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005). (emphasis added).

When considering whether an officer reasonably believed that a person posed an imminent threat of serious bodily harm, courts must consider the totality of the circumstances. Certain factual considerations are particularly relevant, though none is dispositive and the list is not exhaustive: (1) why the officer was called to the scene, (2) whether the officer knew or reasonably believed that the person was armed; (3) whether the person verbally or physically threatened the officer or disobeyed the officer; (4) how far the officer was from the person; (5) the duration of the entire encounter; (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer; and (7) whether the officer could have diffused the situation with less forceful tactics. *Palma v. Johns*, 27 F.4th 419, 423.

When assessing an excessive force claim, the totality of the circumstances includes the fact that at the time of the struggle, the defendant officers had reason to believe that the person was mentally unstable. *Id.* at 419, 423. If an officer knows that person is suffering from some mental illness, the officer must consider that fact and respond accordingly. In other words, behavior that may ordinarily seem threatening may present a lower risk of harm if the officer has reason to believe that the behavior is a symptom of a mental condition. *Id.* at 419, 423.

The diminished capacity of an unarmed person must be considered when assessing the amount of force exerted by an officer. *Id.* at 419, 423. Sometimes the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover. That factor is particularly important in cases involving mental health crises, **where officers should use the least force necessary to subdue the person**. *Id.* at 419, 423. (emphasis added). A court cannot simply defer to an officer's *post hoc* use of mental illness as a justification for using force. Rather, if a jury could find that a reasonable officer would not perceive an imminent threat of danger, or would use other de-escalation tactics, then qualified immunity is unwarranted and improper. *Id.* at 419, 423. After viewing the facts in the light most favorable to the non-moving party, if a jury could conclude that the officer engaged in gratuitous violence by using force beyond the scope of that which was reasonably necessary or justifiable, then the officer is not entitled to qualified immunity at the summary judgment stage. *Id.* at 419, 423.

In the case-at-hand, Joshua Elswick is severely paranoid, suffers from schizophrenia, and expressly and repeatedly informed officers that he was in fear of his life and feared for his safety. He explained that he was currently experiencing a schizophrenic episode and explained that he genuinely believed his life was in danger. Josh was not verbally threatening or hostile with any officer once at BCDC. He followed commands to sit, to wait, and to complete the booking process. Josh Elswick showed no signs of resistance or threatening behavior until Defendant Derrough unnecessarily and without provocation used excessive force by using electrical shock against Josh while he was restrained in handcuffs and shackles. At the time the electrical shock was administered, Josh was unable to harm officers, had no desire to harm officers, and showed no intent or threat of doing so. Defendant actively chose to surround Josh, who was restrained and obviously in mental distress, with a group of officers to remove his handcuffs and shackles.

Addressing the totality of circumstance factors, the excessive force used against Josh Elswick occurred while he was already in custody at BCDC. This makes the original reason for the police call less significant in determining the legality of the force used. Given that Josh had been admitted to BCDC and was in the booking process, Defendant Derrough knew that he was unarmed and duly restrained. Josh had presented no verbal or physical threats to any guards, jail staff members, or others while at BCDC. His later verbal disobedience was the product of being in an obvious mental health crisis, a schizophrenic episode, and being genuinely terrified for his life. In the midst of his mental health crisis and while he was expressing fear for his life, numerous guards directly surrounded Josh, who was still duly restrained, and Defendant Derrough chose to use the G.L.O.V.E. to electrically shock him. Before Josh presented any verbal resistance to any officer, Derrough was putting on the G.L.O.V.E. to begin the process of removing Josh's shackles and cuffs. Derrough retrieved and equipped himself with the G.L.O.V.E without any reason to believe Josh would become resistant or present a threat exceeding that in which handcuffs, shackles, and numerous guards could not sufficiently prevent. Defendant Derrough made the decision to use excessive force on Josh before even entering the booking area to remove his restraints.

As discussed, the Defendant was aware of Josh's mental illness and his current mental status based upon information from other officers and observing Josh while in booking. Josh repeatedly pleaded with Derrough about his mental health condition. Yet, Derrough made no effort to calm Josh or use techniques to de-escalate the situation. Instead, Defendant Derrough ignored Josh Elswick's pleas, ignored Josh's mental illness, ignored Josh's obvious state of mental distress, ignored the numerous guards surrounding him and the handcuffs and shackles restraining him,

ignored potential non-violent de-escalation measures, and immediately began to electrocute Josh repeatedly by applying shock gloves to his bare skin.

Based on the totality of the circumstances, Defendant Derrough's use of the G.L.O.V.E. on Josh Elswick was not objectively reasonable. Defendant Derrough was both suspended and demoted for his use of excessive force against Josh. Because a reasonable jury could find that a reasonable officer would not perceive an imminent threat of danger, or would have used other de-escalation tactics, qualified immunity is unwarranted.

## B.  PLAINTIFF'S RIGHT TO BE FREE FROM GRATUITOUS VIOLENCE WAS CLEARLY ESTABLISHED.

When determining whether a particular right is clearly established, courts ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent. *Id.* at 419, 423. Officers may use non-lethal force, such as tasers or pepper spray, if they have an objective justification for doing so. Specifically, officers may use a taser if a person is particularly violent or physically resistant, so as to endanger responders. *Id.* at 419, 423.

The gratuitous or excessive use of a taser by an officer violates a clearly established constitutional right. The law clearly establishes the right of people who pose no safety risk to the police to be free from gratuitous violence. That legal rule is identified at a sufficiently specific level of generality to qualify as clearly established law. *Id.* at 419, 423.

As established above, Defendant's use of the G.L.O.V.E. does constitute excessive force. Because Josh posed no safety risk to the involved officers and was merely verbally resisting, Josh was clearly entitled to his constitutional right to be free from gratuitous violence.

## C. DERROUGH VIOLATED PLAINTIFF'S CLEARLY ESTABLISHED RIGHT TO HEALTHCARE TREATMENT.

The Supreme Court has held that a prison official's deliberate indifference to conditions that pose a substantial risk to an inmate's health and safety violates the Eighth Amendment. To determine whether an official was deliberately indifferent to such conditions of confinement, we employ a two-pronged analysis with both an objective and a subjective component. The objective prong asks whether the inmate was incarcerated under conditions posing a substantial risk of serious harm. The subjective prong then asks whether officials knew of and disregarded that excessive risk to the inmate's health or safety. *Finley v. Huss,* 102 F.4th 789, 797. By rule, prison officials cannot place a mentally ill inmate into administrative segregation without first consulting a mental-health professional about whether that inmate's mental-health needs can be met in segregation. *Id.* Whether an inmate characterizes his purportedly unlawful treatment as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, the same two-pronged deliberate-indifference inquiry applies. *Id.* When turning to a specific inmate's confinement in any deliberate indifference given case, courts don't look for what is ordinary. *Id.*

Here, Josh argues that while the jail's policies may not explicitly equate mental healthcare with other medical treatments, the fundamental right to adequate mental health care is nonetheless firmly established as part of the state's obligation to meet the basic health needs of incarcerated individuals. This responsibility arises from the understanding that mental health is an integral

component of a person's overall well-being, and neglecting these needs exposes incarcerated individuals to unnecessary harm—harm that the jail system is required to prevent as part of its duty to provide humane treatment.

The absence of specific language in jail policies does not diminish the critical role of mental health care as a key aspect of comprehensive healthcare in correctional settings. Even in the absence of a formal policy linking mental and physical healthcare, untreated mental health issues can lead to significant, immediate risks, such as self-harm or harm to others. These are dangers that jails are obligated to address. The Defendant's reliance on qualified immunity overlooks the reality that incarcerated individuals often need mental health support to maintain basic safety and stability in the facility, regardless of whether jail policies explicitly equate mental health care with other forms of treatment.

Moreover, mental healthcare is not only about treating individual symptoms; it plays a vital role in maintaining the facility's safety and in promoting broader societal goals, such as reducing recidivism and supporting rehabilitation. Denying adequate mental health treatment creates foreseeable harm, violates accepted standards for inmate care, and undermines the protective objectives of incarceration. Consequently, the lack of explicit policy language equating mental health care with other forms of treatment does not absolve the Defendant of the responsibility to address these essential needs and weakens the foundation for a qualified immunity defense in this case.

## <u>CONCLUSION</u>

Because Defendant violated the clearly established constitutional rights of Plaintiff in his use of excessive force and conditions of confinement, Plaintiff, by counsel, respectfully requests the Court DENY Defendant's Motion for Summary Judgment.

Respectfully submitted,

SAM AGUIAR INJURY LAWYERS, PLLC

*/s/ Sara Collins*
Sam Aguiar
Sara E. Collins
Telephone (502) 813-8900
Facsimile: (502) 491-3946
sam@kylawoffice.com
scollins@kylawoffice.com
*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.


*/s/ Sara Collins*
*Counsel for Plaintiff*