UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:23-CV-00033-GNS-CHL

JOSHUA AARON ELSWICK                                              PLAINTIFF

v.

RYAN DERROUGH                                                     DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 55) and Defendant's Motion for Leave to File Excess Pages (DN 57).[1]  The motions are ripe for adjudication.

## I.      BACKGROUND

Plaintiff Joshua Elswick ("Elswick") was arrested in his home on September 3, 2022, after his wife, Shelly, called the Mt. Washington Police Department ("MWPD") to report a domestic disturbance.  (Def.'s Mot. Summ. J. Ex. A, at 1, DN 55-3 [hereinafter Arrest Citation]; Def.'s Mot. Summ. J. Ex. B, at 1, DN 55-4 [hereinafter Dispatch Report]).  Shelly indicated to the MWPD that Elswick was high on methamphetamine and tearing apart their house.   (Dispatch Report 1). Elswick is a self-proclaimed drug addict who also suffers from schizophrenia, bipolar disorder, and intermittent explosive impulse control disorder.  (Elswick Dep. 40:20-24, 42:13-20, Sep. 19, 2023, DN 55-5).  MWPD officer James Puszert ("Puszert") responded to the scene and called Mt. Washington Emergency Medical Services ("EMS") to evaluate Elswick for voluntary

---

[1] Defendant moves for leave to exceed the page limit in his motion for summary judgment (DN 57) under LR 7.1(d).  Plaintiff has not contested Defendant's motion, and it appears allowing Defendant to exceed the page limit would not prejudice Plaintiff or cause unnecessary delay in the proceedings.  Defendant's motion, therefore, is granted.

hospitalization after Elswick indicated he wanted medical and mental health treatment. (Puszert Aff. ¶¶ 12-13, DN 55-6). During the evaluation by EMS, Elswick became violent and attempted to strike the medical staff and bite an MWPD officer. (Puszert Aff. ¶¶ 14-15; Arrest Citation 1). Elswick was tazed during this outburst. (Arrest Citation 2). He was arrested on multiple charges, including assault against a police officer (third-degree) and criminal mischief (first degree). (Arrest Citation 1-2). Elswick has plead guilty to these charges and admitted that he was on a "binger" at the time of the incident. (Def.'s Mot. Summ. J. Ex. E, at 1, DN 55-7; Elswick Dep. 128:20-129:4). Upon arrest, Elswick was transported to the University of Louisville Hospital South, where he was evaluated and cleared for transfer to the Bullitt County Detention Center ("BCDC"). (Puszert Aff. ¶ 20). During transport to BCDC, Elswick had a cup of water, which he took with him into the BCDC booking area. (Puszert Aff. ¶ 22).

Elswick arrived at BCDC around 12:25 a.m. on September 4, where he was initially left in the booking room with only Puszert. (Puszert Aff. ¶¶ 20, 23). Puszert instructed Elswick to sit down while his documentation was being prepared. (Puszert Aff. ¶ 23). Defendant Ryan Derrough ("Derrough"), who was the BCDC shift commander at the time, states that he learned Elswick was "getting up [and] moving around the [booking] room . . . ." (Derrough Aff. ¶¶ 7-8, DN 55-9). Derrough knew from the arrest citation that Elswick had attempted to assault an EMS worker and was tazed in the process. (Derrough Aff. ¶ 7). Derrough stepped into the booking room to observe, finding Elswick's free movement to be a safety risk for Puszert, and instructed Elswick to remain seated. (Derrough Dep. 79:16-23, Sep. 20, 2023, DN 55-8; Derrough Aff. ¶¶ 7-9).[2] At this time,

---

[2] Elswick counters that he "waited patiently and calmly, still restrained, seated on a bench in the booking room for the paperwork to be completed." (Pl.'s Resp. Def.'s Mot. Summ. J. 2, DN 61). He admits that he "did eventually stand up from his seat on the bench but did not attempt to touch any person or property within the booking room." (Pl.'s Resp. Def.'s Mot. Summ. J. 2). Surveillance video confirms that Elswick did stand up at one point while Puszert was preparing

Elswick was wearing leg shackles and handcuffed in the front, which exacerbated Derrough's concern regarding the risk that Elswick's free movement posed. (Derrough Aff. ¶¶ 6-8). After exiting the booking room, Derrough states that he continued to monitor Elswick "getting up and moving around the room" via the surveillance video. (Derrough Aff. ¶ 8; Derrough Dep. 80:10-16).

Approximately an hour later, Derrough and another BCDC employee, Deputy Bleuel ("Bleuel") entered the booking room to begin taking Elswick into custody. (Def.'s Mem. Supp. Mot. Summ. J. 4; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 6, at 00:55-2:15, DN 61-6 [hereinafter Surveillance Video 1145]). Derrough states that Elswick became agitated as he explained that they needed to remove his handcuffs and leg shackles in order to book him. (Derrough Aff. ¶ 11). Derrough believed Elswick was under the influence of an intoxicating substance based upon his speech pattern. (Derrough Aff. ¶ 11). Elswick stated that he was afraid that someone was going to hurt or kill him, indicative of paranoia. (Derrough Aff. ¶ 11). Derrough claims he tried to calm Elswick by explaining why his restraints needed to be removed. (Derrough Aff. ¶ 11). At this point, Derrough called for a BCDC nurse to come into the booking room and evaluate Elswick. (Surveillance Video 1145, at 2:40-5:30; Derrough Aff. ¶¶ 12, 14). Derrough claims this request was based on the BCDC policy for deputies not to contact physicians for the inmates unless there is a medical emergency— rather, the deputy should request for BCDC medical staff to evaluate the inmate and determine if a physician should be called. (Derrough Dep. 31:10-14, 36:12-18).[3]

---

the paperwork; however, there is no footage in the record of Elswick moving around the room. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 3, at 00:01-00:09, DN 61-3 [hereinafter Surveillance Video 8870]). It appears the only evidence of this observation is Derrough's testimony. (Derrough Aff. ¶ 8; Derrough Dep. 79:16-23, 80:10-16).

[3] Elswick contends that "BCDC policy permits deputies to override the decisions of the Quality Correctional Health Care ('QCHC') nurse when that decision affects facility security or is a decision in favor of increased inmate care." (Pl.'s Resp. Def.'s Mot. Summ. J. 4, DN 61). Elswick

Believing Elswick threatened their safety, Derrough called for another BCDC employee, Deputy Vincent ("Vincent"), to assist in removing Elswick's constraints and placing him into custody. (Derrough Aff. ¶ 12). Vincent brought with her a somewhat novel technology for Derrough use: a generated low-output voltage emitter ("GLOVE") compliance system. (Derrough ¶ 12). The GLOVE system comprises of two gloves that BCDC deputies can use to gain compliance from inmates by emitting a low-level shock when contact is made with an inmate's skin. (Derrough Dep. 42:6-13). Derrough completed a GLOVE training course at BCDC. (Derrough Dep. 66:15-21). According to Derrough, the GLOVE emits a much smaller amount of electricity than a taser that makes an inmate not "feel good" and has "about enough [power] to light the little, tiny Christmas tree bulb . . . ." (Derrough Dep. 48:12-18). Unlike a taser, the GLOVE does not weaken the inmate's muscle, is not designed to incapacitate, and its voltage cannot be increased. (Derrough Dep. 48:20-49:10). Before using the GLOVE on Elswick, Derrough attempted to persuade him to comply via verbal de-escalation. (Derrough Aff. ¶¶ 13-15). Despite this approach, Elswick remained agitated, standoffish, and continued to utter paranoid statements. (Derrough Aff. ¶ 15).

Derrough and Bleuel instructed Elswick to stand up and face the wall so that his leg shackles could be removed, but he refused. (Derrough Aff. ¶ 15). At this point, another employee,

---

makes no citation to the record to support this assertion. Derrough refutes this by stating that "a QCHC nurse has authority to decide if an inmate's medical needs require a doctor; deputies can only call 911 for a situation requiring an immediate response to a medical emergency." (Def.'s Reply. Mot. Summ. J. 7-8, DN 65). BCDC medical policy dictates that "[i]n some cases, detention staff can perform health related duties as described in their job descriptions[.]" (Def.'s Mot. Summ. J. Ex. Q, at 2, DN 55-14 [hereinafter BCDC Medical Policy]). This includes "[i]mmediately administer[ing] first aid" in response to an emergency, in conjunction with alerting the medical staff. (BCDC Medical Policy 11). Regardless, the policies expressly state that QCHC "is responsible for medical services at [BCDC]" and "the medical staff . . . shall not be restricted by the jailer in their performances except to adhere to the security requirements." (BCDC Medical Policy 2).

Deputy Noce, entered the booking room to assist.  (Surveillance Video 1145, at 06:30-7:10).  Derrough activated the GLOVE and rested his hands on Elswick's arms.  (Derrough Aff. ¶¶ 16-17; Surveillance Video 1145, at 07:10-45).  Derrough contends that no electricity was administered at this point because he "had not made the requisite points of contact between the GLOVE and [Elswick's] skin."  (Derrough Aff. ¶ 17).  At one point, Elswick stood and faced the wall, but returned to his sitting position before the restraints could be removed.  (Surveillance Video 1145, at 7:45-8:15).  Derrough attempted to direct Elswick to stand and face the wall again by placing his hands on Elswick's shoulder and back, over his clothing.  (Surveillance Video 1145, at 8:15-30).  Elswick once again stood up, but he pushed himself away from the wall and pulled away from the deputies.  (Surveillance Video 1145, at 8:20-35).  Derrough then grabbed Elswick's forearms with the GLOVE—this is the first point Derrough contends electricity would have made contact with Elswick's skin.  (Surveillance Video 1145, at 8:40-45; Derrough Aff. ¶ 22).  A physical altercation between Elswick and the deputies ensued, with Elswick resisting the deputies' attempts to restrain him.  (Surveillance Video 1145, at 8:45-9:10).  After a few seconds, Elswick temporarily stopped resisting, and all the deputies backed away.  (Surveillance Video 1145, at 9:10-25).  After a few minutes of attempted verbal de-escalation, Elswick briefly faced the wall but then turned to the deputies and began physically fighting them.  (Surveillance Video 1145, at 10:55-11:30).  Derrough proceeded to use the GLOVE on Elswick's right elbow, forearms, and wrists.  (Surveillance Video 1145, at 11:00-30; Derrough Aff. ¶¶ 29-30).

The deputies were then able to move Elswick into a temporary holding room.  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 8, at 00:00-10, DN 61-8 [hereinafter Surveillance Video 7089]; Derrough Aff. ¶ 31).  Derrough claims that although the GLOVE was turned on while transporting Elswick, no contact was made with his skin.  (Derrough Aff. ¶ 30).  Once inside the holding cell,

Elswick continued to make statements, such as "just kill me" and "you all are going to kill me, just do it." (Derrough Aff. ¶ 32). Derrough claims the Glove was turned off at this time. (Derrough Aff. ¶ 32). The deputies attempted to remove Elswick's restraints, but he kept resisting. (Surveillance Video 7089, at 00:15-1:00; Def.'s Mot. Summ. J. Ex. J, at 00:00-49, DN 56 [hereinafter Surveillance Video J]). Derrough made an additional contact to Elswick's skin with the GLOVE; however, it is unclear if the GLOVE was re-activated at this time. (Surveillance Video J, at 00:15-45; Derrough Aff. ¶ 38). Elswick continued to fight the deputies, and eventually they left the holding cell. (Surveillance Video J, at 00:15-50).

Elswick remained alone in the cell, still in his restraints, for about 45 minutes. (Derrough Aff. ¶ 45). There was a toilet inside the cell as well as a sink with a water fountain. (*See* Surveillance Video J). Derrough asserts that he watched surveillance video showing Elswick choosing to drink water from the toilet. (Derrough Dep. 109:24-110:5). Elswick does not recall a sink being in the holding cell, but states that "if there was, [he] would have thought it was poisoned water anyway and wouldn't have drank it." (Elswick Dep. 142:9-14). After about 45 minutes, the deputies re-entered the cell, surrounded Elswick, and held him down onto the floor. (Def.'s Mot. Summ. J. Ex. K, at 00:00-1:15, DN 56 [hereinafter Surveillance Video K]). Derrough was not wearing the GLOVE at this time. (*See* Surveillance Video K). Eventually, they were able to remove his restraints. (Derrough Aff. ¶¶ 43-45). Believing Elswick was a danger to himself and others, Derrough decided Elswick needed to be placed in a WRAP restraint system, fully restricting his arms and legs. (Derrough Aff. ¶ 42; Def.'s Mot. Summ. J. Ex. L, at 00:00-2:05, DN 56 [hereinafter Surveillance Video L]). After the WRAP was administered, Elswick was put onto a cart and turned to face the surveillance camera. (Surveillance Video L, at 2:45-5:55).

Over the next several hours, various BCDC employees, including Derrough, periodically conducted in-person checks on Elswick. (Derrough Dep. 109:4-15). Derrough's shift ended in the morning of September 4, after which he had no further contact with Elswick.[4] (Derrough Dep. 109:4-15). Elswick was held in an isolation cell until his release from BCDC on September 9. (Elswick Dep. 151:15-19). Upon release, Elswick went to the hospital, where he complained of pain in his arms and neck. (Elswick Dep. 155:13-19 (stating "[i]t felt like if you burn yourself and then three days later you got like that weird feeling skin.")). Major Dinarte Pimentel ("Pimentel") investigated the incident and found that Derrough's use of the GLOVE constituted an excessive use of force.[5] (Pl's Resp. Def.'s Mot. Summ. J. Ex. 9, at 1, 13, DN 61-9 [hereinafter Investigation Report]). Subsequently, Derrough was demoted from his rank of Lieutenant to the rank of Sergeant. (Investigation Report 13).

Elswick has sued Derrough in his individual capacity for violations of his constitutional rights under federal law. (Compl. ¶ 3, DN 1). Elswick brings two causes of action: (1) excessive force in violation of the Fourteenth Amendment[6] under 42 U.S.C. § 1983 and (2) unconstitutional conditions of confinement and deprivation of access to adequate mental health and medical treatment in violation of the Fourteenth Amendment pursuant to Section 1983. (Compl. ¶¶ 38-63). Derrough has moved for summary judgment on all claims. (Def.'s Mot. Summ. J., DN 55).

---

[4] Elswick claims that there was one additional interaction, in which Derrough checked on Elswick through the hole in the cell door and refused him water. (Elswick Dep. 151:15-25).

[5] Pimentel has since qualified his findings by stating he "had never performed an internal investigation before this date." (Pimentel Aff. ¶ 6, DN 55-11). He also stated that "[a]t the time, BCDC policy did not include the proper procedure, use, and/or restrictions for deputies' use of the GLOVE" and "[t]he conclusions made . . . were not based on [his] application of any formal BCDC policies on the use of force but were based on [his] own personal opinion of what happened." (Pimentel Aff. ¶ 10).

[6] In this cause of action, Elswick also references that his Fourth Amendment rights were violated. (Compl. ¶ 47). Whether Elswick can bring a claim under the Fourth Amendment is discussed below.

## II.    JURISDICTION

The Court has subject-matter jurisdiction because a federal question is presented.  *See* 28 U.S.C. § 1331.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party moving for summary judgment may satisfy its burden [of] show[ing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'"  *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-moving party's claim.  *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case[,]" or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  "The mere existence of a scintilla of evidence in support of the [moving party's] position [is] [] insufficient; there must be evidence on which the jury could reasonably find for the [moving party]."  *Anderson*, 477 U.S. at 252.

When are the events of a case are captured on video or a bodycam, courts are to "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). If the video evidence "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citation omitted). Furthermore, if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment should be denied. *Anderson*, 477 U.S. at 250.

## IV.    DISCUSSION

### A.    Section 1983 Claim for Excessive Force

#### 1.    *Qualified Immunity Standard for Excessive Force*

Section 1983 does not provide substantive rights to a plaintiff but creates a mechanism for a remedy when there is a deprivation of a constitutional right or an otherwise established right. *See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). The Supreme Court has held that qualified immunity generally shields "government officials performing discretionary functions . . . for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982) (citations omitted). As the Sixth Circuit has instructed, summary judgment is the correct stage of the litigation to determine a qualified immunity defense. *See Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015).

A plaintiff has the burden of showing a defendant is not entitled to qualified immunity when a defendant raises the initial qualified immunity defense. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted). A defendant must first provide facts showing that the

actions taken were within his or her discretionary authority. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). Here, Derrough was performing a discretionary function, because BCDC policy afforded deputy jailers ample discretion to use "objectively reasonable force when necessary to maintain the order and security of the jail . . . ." (Def.'s Mot. Summ. J. Ex. O, at 1, DN 55-12 [hereinafter BCDC Use of Force Policy]); *see also Paul v. Whitley Cnty. Det. Ctr.*, 712 F. Supp. 3d 907, 921 (E.D. Ky. 2024) (finding that, under Kentucky law, a deputy jailer "had the discretionary authority to use reasonable force to police the rules of the Detention Center . . . .").

Derrough argues that qualified immunity applies to the excessive force claim because he performed a discretionary function within the scope of his authority, used reasonable force, and no clearly established law indicates his actions violated a constitutional right. (Def.'s Mem. Supp. Mot. Summ. J. 13-23). The Sixth Circuit has explained when qualified immunity applies to an officer's actions:

> Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful. The qualified immunity analysis is a two-step inquiry: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order. The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (internal quotation marks omitted) (internal citations omitted) (citation omitted).

## 2.    *Derrough's Use of the Shock Gloves*[7]

### a.    **Violation of a Constitutional Right**

Elswick was a pre-trial detainee during the events for which this action arose.  The Supreme Court has delineated between the rights of pre-trial detainees and sentenced prisoners.  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  (citations omitted)).  Elswick claims that Derrough's alleged use of excessive force violated his "clearly established rights guaranteed under the Fourth and Fourteenth Amendment[s]."  (Compl. ¶ 47).  The Due Process Clause of the Fourteenth Amendment is the proper avenue for a pre-trial detainee bringing a Section 1983 action for excessive force.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 393 (2015).  The Supreme Court has expressly acknowledged that it has "not yet decided [the] question" whether "a pretrial detainee can bring a Fourth Amendment claim based on the use of excessive force by a detention facility employee."  *Id.* at 408 (Alito, J., dissenting).  The Sixth Circuit has also not yet weighed in on this issue.  Therefore, the Court will not consider a Fourth Amendment violation under Section 1983 and will instead focus its analysis on the Fourteenth Amendment.

---

[7] It is unclear whether part of Elswick's claim for excessive force includes the BCDC's use of the WRAP restraint.  The Complaint makes no mention of the WRAP restraint within Elswick's excessive force cause of action.  (*See* Compl. ¶¶ 39-51).  Derrough preemptively argues that he should be afforded qualified immunity for any claim Elswick may bring regarding he WRAP restraint.  (Def.'s Mem. Supp. Mot. Summ. J. 23-24).  Elswick's response makes no mention of the WRAP being used in an excessively forceful way.  Therefore, the Court will not analyze whether the use of the WRAP restraint constituted excessive force, and any potential claim Elswick may have brought regarding its use will be dismissed.  *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited."  (citations omitted)).

Although the Sixth Circuit has "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric[,]'" this analysis was modified by the Supreme Court's ruling in *Kingsley v. Hendrickson*. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (citation omitted), *abrogated on other grounds by Brawner v. Scott Cnty.*, 14 F.4th 585, 591-97 (6th Cir. 2021); *see also Brawner*, 14 F.4th at 596 ("Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable."). Under the *Kingsley* standard, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 389. This standard should not be applied mechanically and "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citation omitted). The analysis also defers to "'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (alteration in original) (quoting *Wolfish*, 441 U.S. at 540).

The Supreme Court has articulated that the following non-exhaustive list of factors should be balanced in making this determination:

[1]     the relationship between the need for the use of force and the amount of force used;
[2]     the extent of the plaintiff's injury;
[3]     any effort made by the officer to temper or to limit the amount of force;
[4]     the severity of the security problem at issue;
[5]     the threat reasonably perceived by the officer; and
[6]     whether the plaintiff was actively resisting.

*Id.* (quoting *Graham*, 490 U.S. at 396). In the current case, Derrough argues that his use of the GLOVE against Elswick was *de minimis* and should not be considered a constitutional violation. (Def.'s Mem. Supp. Mot. Summ. J. 19-20). The "excessive-force claimant must show something more than *de minimis* force" in order to establish a constitutional violation under the Fourteenth Amendment. *Leary v. Livingston Cnty.*, 528 F.3d 438, 443 (6th Cir. 2008) (citations omitted). The Sixth Circuit has found quick, non-injurious actions against pre-trial detainees, such as a "karate chop" to the back of the head and a "split-second shove into the wall[,]" to be nothing more than *de minimis*. *Id.*; *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 530-31 (6th Cir. 2018). "Although a pretrial detainee's injuries must be more than *de minimis* to support a constitutional violation, they need not be 'serious' or 'significant,' as long as there is some degree of actual injury." *United States v. Budd*, 496 F.3d 517, 530-31 (6th Cir. 2007) (internal citations omitted) (citation omitted). Taking the evidence in the light most favorable to Elswick, it appears that he did complain of injuries from the GLOVE, akin to a light burn, once he was in the hospital upon release. (Elswick Dep. 155:13-19). Although Derrough contends that the shock from the GLOVE "emit[s] a small amount of energy[,]" it cannot be determined that the multiple shocks to Elswick's skin constitute only a *de minimis* use of force. (Def.'s Mem. Supp. Mot. Summ. J. 19).

Therefore, the Court must look to the *Kingsley* standard to determine if Derrough's use of force was objectively unreasonable and violated Elswick's Fourteenth Amendment rights. It should be noted that in his response, Elswick cites to numerous cases that provide standards inapplicable to this case.[8] In fact, Elswick makes no reference to *Kingsley* or its progeny in his

---

[8] Elswick has not brought a state law claim, so standards relevant to "qualified official immunity" under Kentucky law do not apply to his Section 1983 claims. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. 6 (citing *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2003))). Moreover, Elswick's claim does not concern Fourth Amendment protections from an officer's excessive force, so the factors cited in those cases are also inapplicable here. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. 6-8 (citing *Jacobs*

response, which sets forth the applicable standard for determining excessive force against a pre-trial detainee. The Court is left with Elswick's factual assertions and conclusory language, which it will weigh against Derrough's legal arguments regarding whether his actions were objectively reasonable.

The first *Kingsley* factor is "the relationship between the need for the use of force and the amount of force used . . . ." *Kingsley*, 576 U.S. at 397. Derrough contends that "the need for the use of force was high, given [Elswick's] assaultive behavior during arrest, . . . his combativeness and hostility, multiple refusals to comply with simple requests to remove restraints, and heightened sense of paranoia and apparent intoxicated state." (Def.'s Mem. Supp. Mot. Summ. J. 20). Elswick asserts that "[a]t the time the electrical shock was administered, [he] was unable to harm officers, had no desire to harm officers, and showed no intent or threat of doing so." (Pl.'s Resp. Def.'s Mot. Summ. J. 8). This statement ignores the fact that Derrough was aware of Elswick's hostile tendencies, evidenced by the account of his violent actions in the arrest citation. (Puszert Aff. ¶¶ 14-15; Arrest Citation 1). The objective reasonable analysis must take into consideration what the officer knew at the time the force was administered. *Kingsley*, 576 U.S. at 396-97 (citation omitted). It was reasonable for an officer in Derrough's position to believe the GLOVE was necessary, given the fact that Elswick was prone to outbursts and was suspected of being intoxicated. The first factor weighs in favor of objective reasonableness.

The second factor is the extent of the plaintiff's injury. *Kingsley*, 576 U.S. at 397. Elswick states that he complained to the hospital staff about light burns he received from Derrough's use of the GLOVE. (Elswick Dep. 155:13-19). Although it cannot be determined whether this

---

*v. Alam*, 915 F.3d 1028 (6th Cir. 2019); *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015); *Palma v. Johns*, 27 F.4th 419 (6th Cir. 2022))).

constitutes a *de minimis* use of force, there is no question that Elswick's injuries were not significant. He has provided no evidence in the record that he required treatment for burns, nor has he alleged any permanent damage. Because the injury was minimal, the second factor weighs in favor of objective reasonableness.

The third factor is "any effort made by the officer to temper or limit the amount of force . . . ." *Kingsley*, 576 U.S. at 397. Derrough avers that multiple attempts were made to verbally deescalate his interaction with Elswick prior to using the GLOVE. (Derrough Aff. ¶¶ 13-15). Elswick argues that "Derrough retrieved and equipped himself with the G.L.O.V.E without any reason to believe [Elkins] would become resistant or present a threat exceeding that in which handcuffs, shackles, and numerous guards could not sufficiently prevent." (Pl.'s Resp. Def.'s Mot. Summ. J. 9). This point is not well-taken. Derrough's preparation in retrieving the GLOVE does not equate to the use of force against Elswick. Elswick also refutes the contention that Derrough attempted to calm Elswick before using the GLOVE to shock him. (Pl.'s Resp. Def.'s Mot. Summ. J. 9). The video surveillance does not contain audio but demonstrates that Derrough and the other deputies spoke with Elswick for several minutes before any force was used. (Surveillance Video 1145, at 06:30-7:10). In fact, it appears that the first use of the GLOVE occurred after Elswick began pushing away from the deputies and resisting their efforts to secure him. (Surveillance Video 1145, at 8:20-35). This third factor weighs in favor of reasonableness.

The fourth factor is the "severity of the security problem at issue . . . ." *Kingsley*, 576 U.S. at 397. Derrough states that Elswick's ability for free movement presented a security risk, given his combativeness earlier that evening. (Derrough Aff. ¶¶ 6-8). He also reasons that the booking room "was attached to the unsecured sally port, leading to an increased potential for escape." (Def.'s Mem. Supp. Mot. Summ. J. 21). Elswick argues that he was "duly restrained" and

"presented no verbal or physical threats to any guards, jail staff members, or others while at BCDC." (Pl.'s Resp. Def.'s Mot. Summ. J. 9). The video surveillance indicates that Elswick was combative with the deputies when they attempted to remove his restraints. (Surveillance Video 1145, at 7:45-8:15). Additionally, despite being restrained by leg shackles and handcuffs, Elswick clearly had the ability to move his arms and legs when combatting the deputies. (Surveillance Video 1145, at 7:45-8:15). It was not objectively unreasonable for Derrough to view Elswick's potential mobility as a security rick, given the proximity of the booking room to the unsecured sallyport. The fourth factor, therefore, weighs in favor of Derrough.

The fifth factor and sixth factors concern "the threat reasonably perceived by the officer" and "whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. Because these factors turn on the same set of facts, they will be analyzed together. Defendant argues that Elswick "was a credible threat to assault anyone in his presence or destroy property that was within his reach[,]" as he had previously "punched an EMS worker, destroyed EMS equipment, and tried to bite Officer Puszert." (Def.'s Mem. Supp. Mot. Summ. J. 21-22). He also states that Elswick "blatantly ignored" the deputies' requests "to safely remove his restraints." (Def.'s Mem. Supp. Mot. Summ. J. 22). Elswick claims that his "later verbal disobedience was the product of being in an obvious mental health crisis, a schizophrenic episode, and being genuinely terrified for his life." (Pl.'s Resp. Def.'s Mot. Summ. J. 9). Elswick may have been suffering from a mental health crisis, but this does not change the fact that he acted violently towards officers and EMT workers mere hours before arriving at BCDC, and Derrough was aware of this fact. (Arrest Citation 1; Derrough Aff. ¶ 7). The video surveillance demonstrates that each of Derrough's uses of the GLOVE were in response to Elswick's resistance to the deputies' commands, either by continually sitting down or

pushing away.  (Surveillance Video 1145, at 7:45-8:15; Surveillance Video 7089, at 00:15-1:00).

Thus, factors five and six weigh in favor of objective reasonableness.

Based upon the standard set forth in *Kingsley*, it is clear that Derrough acted in an objectively reasonable manner when using the GLOVE to remove Elswick's restraints.  Plaintiff has failed to demonstrate that Derrough violated his Fourteenth Amendment rights, and Derrough, therefore, is entitled to qualified immunity.  Derrough's motion for summary judgment is granted as to the Section 1983 claim for excessive force.[9]

### b.    Clearly Established Constitutional Right

Even if Elswick could demonstrate that Derrough violated his Fourteenth Amendment rights, he must also show that this right was clearly established to overcome qualified immunity. *Getz*, 833 F.3d at 652 (citation omitted).  The "salient question in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional."  *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (internal quotation marks omitted) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2022)).  Indeed, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) (citation omitted).  Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Getz*, 833 F.3d at 652 (quoting *Johnson*, 790 F.3d at 653).  The unlawfulness of an

---

[9] Elswick also notes a BCDC investigation concluded that Derrough's use of the GLOVE against Elswick was excessive.  (Investigation Report 1, 13).  As mentioned previously, Pimentel, the officer who conducted the investigation has stated that "[t]he conclusions made . . . were not based on [his] application of any formal BCDC policies on the use of force but were based on [his] own personal opinion of what happened."  (Pimentel Aff. ¶ 10).  Pimentel's findings took no consideration of the *Kingsley* factors and is not dispositive of this Court's determination.

officer's actions 'can be "clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *Hope*, 536 U.S. at 742-44).   In the current case, Elswick has provided no pertinent authority demonstrating that Derrough violated a clearly established right.   Thus, even if Derrough had committed a constitutional violation, he would still be entitled to qualified immunity on these grounds.

### B.   Section 1983 Claim for Deliberate Indifference to Serious Medical Need

#### 1.   *Standard for Deliberate Indifference*

The Sixth Circuit has extended the Supreme Court's holding in *Kingsley*, modifying the subjective component of the deliberate indifference test for pre-trial detainees bringing Section 1983 claims under the Fourteenth Amendment.   *See Brawner*, 14 F.4th at 596-97.   Thus, the test for deliberate indifference to a pre-trial detainee's medical needs under the Fourteenth Amendment contains:   (1) an objective component, which mirrors the objective test under the Eighth Amendment; and (2) a modified subjective component.   *See id.* at 591, 596.   To meet the objective test, "a plaintiff must show that the medical need is 'sufficiently serious.'"   *Id.* at 591 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).   The modified subjective test is not as straightforward; however, the Sixth Circuit provides guidance:

> Mere negligence is insufficient.  A defendant must have not only acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  A pretrial detainee must prove "more than negligence but less than subjective intent—something akin to reckless disregard."

*Id.* at 596 (internal citation omitted) (citations omitted).   The court in the *Brawner* then summarized the new standard:

> To meet [the] burden to show that [the] [medical provider] violated [the plaintiff's] constitutional right to adequate medical care, [the plaintiff] need[s] to present

evidence from which a reasonable jury could find (1) that [the plaintiff] had an objectively serious medical need; and (2) that [the] [medical provider's] action (or lack of action) was intentional (not accidental) and [] either (a) acted intentionally to ignore [the plaintiff's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the plaintiff], even though a reasonable official in [the medical provider's] position would have known that the serious medical need posed an excessive risk to [the plaintiff's] health or safety.

*Id.* at 597.

This Court has cautioned against conflating a Section 1983 claim under the Fourteenth Amendment with a claim that is more appropriately brought as a state tort action. *See Browder v. Hopkins Cnty.*, No. 4:22-CV-00065-JHM, 2024 WL 733646, at *3 (W.D. Ky. Feb. 22, 2024) ("Where 'a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second[-]guess medical judgments and to constitutionalize claims which sound in state tort law.'" (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976))). Similarly, a sister court noted that "*Brawner* did not change the principle that mere medical negligence, nor a disagreement between treater and patient as to the better course of treatment, does not equate to a constitutional violation[] under . . . the Fourteenth Amendment." *Vontz v. Hotaling*, No. 2:19-CV-12735, 2023 WL 2881350, at *6 (E.D. Mich. Mar. 6, 2023) (citing *Brawner*, 14 F.4th at 596).

### 2. *Elswick's Medical/Mental Health Needs*

#### a. **Serious Medical Need**

In determining whether Derrough acted with deliberate indifference, the first step is to assess if Elswick had an "objectively serious medical need." *Brawner*, 14 F.4th at 597. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Baynes*, 799 F.3d at 618 (citation omitted). In the current case, Elswick bases his serious medical

need as one for mental healthcare, arguing "that while the jail's policies may not explicitly equate mental healthcare with other medical treatments, the fundamental right to adequate mental health care is nonetheless firmly established as part of the state's obligation to meet the basic health needs of incarcerated individuals." (Pl.'s Resp. Def.'s Mot. Summ. J. 12). In this way, Elswick's schizophrenic episode must have been "so obvious [to Derrough] that even a lay person would easily recognize the necessity for a doctor's attention." *Baynes*, 799 F.3d at 618.

Derrough acknowledged that Elswick's paranoia was apparent based upon his verbalized fear that the deputies were going to kill him. This acknowledgment, however, must be contextualized to what a reasonable person in Derrough's position would perceive. *Baynes*, 799 F.3d at 618 (citation omitted). Derrough believed Elswick was under the influence of an intoxicant based upon his slurred speech pattern. (Derrough Aff. ¶ 11). Indeed, Elswick's drug screen indicated that he had four different controlled substances in his system during this interaction: amphetamines, benzodiazepines, methamphetamines, and ecstasy. (Def.'s Mot. Summ. J. Ex. M, at 1, DN 55-10). Furthermore, Derrough had only "very general [and] basic" trainings specific to recognizing inmates' potential mental health crises" that was limited to identifying "people harming themselves . . . . [and] intoxicated on substances." (Derrough Dep. 37:11-19). The BCDC medical policy indicates that deputies are required to administer first aid in emergency situations;[10] however, it is the QCHC nurses who are responsible for administering general medical services to inmates. (BCDC Medical Policy 2, 11-12). Derrough knew that the University of Louisville Hospital South evaluated and cleared Elswick for transfer to BCDC. (Puszert Aff. ¶ 20). He also

---

[10] The following emergency situations are expressly stated in the BCDC Medical Policy: severe bleeding, loss of consciousness or seizure, serious breathing difficulties, head injury, severe burns, suicide attempt, sudden on-set of bizarre behavior, health or life-threatening situations, or drug or alcohol withdrawal. (BCDC Medical Policy 11). None of these conditions appear to apply to Elswick's behavior in the booking room.

requested for the BCDC nurse to come into the booking room and evaluate Elswick, adhering to BCDC protocol.  (Surveillance Video 1145, at 2:40-5:30; Derrough Aff. ¶ 14).

Based upon Elswick's apparent intoxication and the fact that multiple medical professionals did not believe he required hospitalization, a lay person in Derrough's position would not have found Elswick's behavior to necessitate attention from a physician.  Elswick has failed to demonstrate that he had "an objectively serious medical need." *Brawner*, 14 F.4th at 597.  For this reason, Derrough is entitled to qualified immunity and his motion for summary judgment is granted on the deliberate indifference claim.

### b.    Intentional and/or Reckless Conduct

Even if Elswick could demonstrate he had a serious medical need, he would still need to show that Derrough acted with deliberate indifference.  To satisfy the second prong of the *Brawner* test, Elswick must present evidence that a reasonable jury could find that (1) a defendant's "action (or lack of action) was intentional (not accidental)" and (2) the defendant "either (a) acted intentionally to ignore [Elswick's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Elswick] . . . ."  *Brawner*, 14 F.4th at 597.  The fact that Derrough, following BCDC protocol, brought a nurse to the booking room to evaluate Elswick prior to using any force illustrates that he did not fail to act reasonably in mitigating an alleged risk.  As mentioned previously, Derrough's duties relating to medical care were limited to expressly delineated emergency situations.  (BCDC Medical Policy 11-12).  Elswick has failed to prove that Derrough acted recklessly "in the face of an unjustifiably high risk of harm . . . ."  *Brawner*, 14 F.4th at 596 (citation omitted).  Elswick's deliberate indifference to a serious medical claim fails on these grounds as well.

C.      **Section 1983 Claim for Unconstitutional Conditions of Confinement**

The "Fourteenth Amendment applies to conditions-of-confinement claims brought by pretrial detainees." *Bensfield v. Murray*, No. 4:21-CV-P104-JHM, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner*, 14 F.4th at 591). This test resembles the analysis for deliberate indifference to a serious medical need. To successfully bring this claim, a pre-trial detainee must first show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834). Next, he must show that the defendant "acted deliberately and recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (internal quotation marks omitted) (quoting *Brawner*, 14 F.4th at 596) .

Elswick's claim for deliberate indifference to a serious medical/mental health need has already been dismissed. As such, it appears the only remaining claim is that Elswick was "deprived of water for over four (4) hours . . . ." (Pl.'s Resp. Def.'s Mot. Summ. J. 4). Derrough repeatedly denies that Elswick was deprived of water. (Def.'s Mem. Supp. Mot. Summ. J. 30). The surveillance video shows that there was a sink inside of Elswick's holding cell. (*See* Surveillance Video J). Elswick claims he does not remember the sink in the cell, but states that "if there was, [he] would have thought it was poisoned water anyway and wouldn't have drank it." (Elswick Dep. 142:9-14). Derrough also avers that the BCDC nurse provided Elswick with water while he was in the WRAP restraint. (Derrough Dep. 106:4-10). Even if Elswick had not been provided water during these four hours, he has not provided any authority to support the conclusion that this inaction would constitute a "substantial risk of serious harm." *Bensfield*, 2022 WL 508902, at *2. For this reason, Elswick's Section 1983 claim for unconstitutional conditions of confinement must be dismissed. Derrough's motion for summary judgment is granted as to this claim.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Defendant's Motion for Leave to File Excess Pages (DN 57) is **GRANTED**.

2.    Defendant's Motion for Summary Judgment (DN 55) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**

3.    The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

June 10, 2025

cc:    counsel of record